Curia, per Evans, J.
The jury'have found the prisoner guilty. There is no complaint of any error in law in the charge of the Circuit Court; which, on the facts, was as favorable to the prisoner as he could have desired. The only question submitted to this Court is, whether the facts proved make the case one of murder or manslaughter. In questions affecting human life, even the life of the most depraved, this Court is not governed by the same cold and inflexible rules by which it proceeds in questions of property. The humane maxim of the criminal law is, that all doubts are to be solved in, favor of the prisoner; Nay, it is even said, it is better that *101 ninety and nine guilty should escape rather than one innocent man should suffer death. If the jury have withheld from the( prisoner the benefit of these merciful maxims, it is the duty of the Court to give him the benefit of them, by granting him a new trial. This Court is not unmindful of its duty in this respect, arid we have approached the prisoner’s case with- a due sense of our responsibility to him and to. the country. The question is — is the prisoner guilty of murder?
The main ingredient of murder is malice; which may be proved by previous threats, former grudges, hatred and ill-will, or it may be inferred from the facts attending the homicide, shewing a cruel and vindictive temper, a wantonness in the destruction of human life, and a heart regardless of social duiy and fatally bent upon mischief. The former is denominated express, and the latter implied malice; and these I propose to consider separately in reference to the evidence of the case. 1. Is there evidence of express malice? In looking through the evidence as reported, one cannot fail to be struck with horror at the prisoner’s repeated declarations to Rose, “I don’t expect to die a natural death; I expect to have to kill Josh (meaning his father) some time. He won’t let me alone. We are always quarrelling and fighting whenever we meet.” It is argued that this does not import malice'; that he may have meant no more than, from the way in which he was treated by his father, he apprehended that, in some rencontre between them, the necessity of killing his father might be forced on him in self defence. ’This may possibly be so; but there is no evidence, from their preceding intercourse, that there was any likelihood of any such event. If we are to judge of the past by what occurred on the night^of the homicide, we should be more apt to conclude that the quarrelling and fighting on previous occasions was the result of the misconduct of the prisoner. It is very-certain he had meditated on such an event, and that it was not a casual thought, but one over which his mind had brooded; a settled purpose; for Rose says he heard him repeat it several times. But it is said the previous quarrels had been reconciled, and that the subsequent killing on sudden quarrel should be referred to that and not to the previous malice. The rule of law is, that where there has been a reconciliation, the homicide is not necessarily to be referred to the ancient grudge, if from the circumstances of the case it appears to have grown out of the recent provocation. This is a question of fact. If the facts show that the quarrel was of the prisoner’s seeking, that it arose out of his misconduct, the jury might well conclude that he sought the occasion to execute a preconceived design, of which his subsequent declaration to Rose, that “ I picked my place, and gave it him here,” (motioning with his hand to his breast,) was evidence.
*102 2. Was there evidence of implied malice? On this subject it is not possible to lay down any precise rules to govern all cases. The conclusion must be drawn from all the facts which occurred at the time. Was the homicide committed in sudden heat and passion, excited by reasonable provocation ? If so, it is only manslaughter. But what is reasonable provocation must depend on circumstances. If one man strike another, and the other, having a weapon in his hand, kill him, this is, in general, manslaughter; but. I do not suppose any such conclusion would follow if the blow was given by a feeble woman or a child. If the provocation be slight, as mere words, or there be evidence of deliberation, the case will be murder, although the quarrel was sudden and the parties had been, up to that time, friendly. Even in cases of mutual combat, if one begin the fight with a mortal weapon, it is murder; for in all such cases the combat must have been begun on equal terms to reduce the offence to manslaughter.
The facts of this case, immediately connected with the homicide, are these, as proved by both the witnesses. The company laughed at something that was said. The prisoner said, “If you don’t quit laughing at me, I’ll pull out my knife and cut some of you.” The deceased said, “ Don’t pull out your knife here; you’d better go along home and go to bed.” The prisoner: “I won’t go to bed.” Deceased said, “You had better go home or go to bed.” Prisoner: “I have a home, and I’ll go when I please.” The prisoner pulled his knife out of his pocket. The deceased said, “Dou’t open 51011 r knife here, or I’ll knock you in the fire.” The prisoner opened his knife. Soon after, the prisoner was on the floor, probably pushed out of his chair by the deceased. The prisoner cut the deceased on the- legs. The deceased struck him with a chair; a combat ensued, in which the deceased was stabbed in the breast with the knife and died in a short time.
In reviewing the facts of this case we cannot avoid the conclusion that the prisoner’s conduct throughout was most unjustifiable. His threat to pull out his knife and cut some one, was without excuse. His refusal to go home and go to bed, and opening his knife, in defiance of his father’s orders to the contrary; his cutting his father’s legs for no higher provocation than pushing him out of his chair on to the floor, was not merely disobedient, but it was barbarous and bloodthirsty. It does not appear that the deceased in the first instance did more than to push him out of the chair m which the prisoner was sitting, next to the deceased; and this I think he 'might well have done, consistently with law, when the prisoner had an open knife in his hand, which he had drawn with the avowed purpose of cutting some one. Another fact worthy of notice is, that the occurrence took place in the house of the deceased, and that he had requested the prisoner to go *103 home or to go to bed, both of which he had refused, declaring his purpose not to go until he pleased.
The law is clear that under the circumstances the deceased had a right to put him out,-and to use any force necessary to accomplish that object. The degree of force always must depend on the circumstances of the case. The law does not require so great an absurdity as that a man should lay his hands gently on an intruder into his house who has refused to depart, and is armed with a drawn knife in his hand. There is nothing then in the case which would have authorized the prisoner to use his knife, by the infliction of wounds on the legs of the deceased : it is even doubtful if he did not use the knife simultaneously, or before he was pushed from the chair. Up to this time the deceased had used no unlawful violence, and the bloody combat which followed was but the natural result of the prisoner’s unlawful act in cutting the deceased with his knife — and, but that he was on the floor and could not reach higher, it is not unlikely that the blow which was aimed at his legs would have been directed at his heart. In short, there are so many circumstances of brutality indicating a recklessness of human life, of “a heart devoid of social duty, and fatally bent upon mischief,” that I think the jury were well warranted in finding the prisoner guilty of murder, independently of the proof of express malice, even if the parties had stood in the relation of strangers to each other.
By the laws of most nations, as well barbarous as civilized, the relation of parent and'child is regarded as one of peculiar-sanctity. One great nation of antiquity looked upon the crime of parricide as impossible, and therefore provided no punishment for it. The prisoner is only 22 years old — an age at which, by the laws of most of the civilized nations of Europe, he was still under parental control, and bound to obedience. By our law he was emancipated from the,dominion of his father, but he was not thereby freed from the moral obligation to honor and reverence the author of his being. I can hardly conceive of a case in which the death of a parent by the hand of a child can be less than murder, except in self-defence. A blow from a woman or child would’ not, except in very extraordinary cases, mitigate thé offence to manslaughter, because a blow given by such a person ought not, in a rational mind, produce that transport of passion on account of which the law attributes the homicide to human infirmity. The same reason, I think, should apply to a blow given by a parent. Forbearance would seem to grow necessarily out of the relation of the parties, and in general will be found to exist except in those fiery tempers which equally disregard -the laws of God and man. But the case does not require it, and 1 do not propose to prosecute this discussion any further.
No inflexible rule can be laid down to govern every case. *104 There must be some modification to every rule, growing out of the infinite diversity of human transactions. It may be that some allowance should be made in the case of the prisoner. The rudeness of his conduct towards his father may have grown out of defective moral discipline, and that the bloody tragedy which terminated in the murder of his father is but the natural result of that father’s evil example. But be this as it may, he has had the advantage of a most humane and favorable charge from the Circuit Judge, and we are unable to find any error in the verdict of the jury. The motion for a new trial must therefore be dismissed.
Wardlaw, Frost and Withers, JJ., concurred.

Motion refused.